IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| KENNETH D. BELL, in his capacity as court-appointed Receiver for Rex Venture Group, LLC d/b/a ZeekRewards.com,<br><br>Plaintiff,<br><br>vs.<br><br>PEAK USA, LLC, PEAK IMPACT, LLC, and GARY BESSONI,<br><br>Defendants. | No. 3:15-cv-233 |

## COMPLAINT

Kenneth D. Bell (the "Receiver"), as Receiver for Rex Venture Group, LLC ("RVG") d/b/a www.ZeekRewards.com ("ZeekRewards" or "Zeek"), alleges as follows:

## SUMMARY OF CLAIMS

1. From January 2011 until August 2012, RVG operated a massive Ponzi and pyramid scheme through ZeekRewards, an internet based so-called "MLM" (multi-level marketing) program, in which over 700,000 participants lost over $700 million dollars. This lawsuit is one of several steps the Receiver is taking pursuant to his court-ordered duties to the Receivership Estate to recover fraudulent transfers and damages for the harms incurred by RVG.

2. Defendant Gary Bessoni played an important role in perpetuating the ZeekRewards scheme. Through his two shell companies, Peak USA, LLC and Peak Impact, LLC, Defendant Bessoni claimed to provide potential customers for RVG's penny auction website, Zeekler.com. These contacts or "leads" were then distributed or sold to ZeekRewards participants to be used as part of the participants' requirements to gain points to supposedly

profit from the Zeekler penny auctions. In reality, however, the leads Bessoni sold to RVG were of little or no value to the auction business. Instead, the leads were used to provide a cover of false legitimacy for and perpetuate the ZeekRewards Ponzi and pyramid scheme. Defendant Bessoni is therefore liable to repay the Receiver the more than $3.3 million he received from RVG through the two shell company co-defendants.

## THE PARTIES

### The Receiver

3. Kenneth D. Bell is the Receiver appointed by this Court in *Securities and Exchange Commission v. Rex Venture Group, LLC d/b/a ZeekRewards.com and Paul Burks*, Civil Action No. 3:12 cv 519 (the "SEC Action") for and over the assets, rights, and all other interests of the estate of Rex Venture Group, LLC, d/b/a ZeekRewards.com and its subsidiaries and any businesses or business names under which it does business (the "Receivership Entities").

### The Receivership Entity

4. The primary Receivership Entity, Rex Venture Group, LLC, is a Nevada limited liability company with its former principal place of business in Lexington, North Carolina. RVG wholly owned and operated ZeekRewards, an internet website (www.zeekrewards.com) with a physical location for operations in Lexington, North Carolina, and internet customers and contacts in this judicial district and throughout the United States and internationally. RVG also owned and operated Zeekler.com, an online auction business.

### The Defendants

5. Gary Bessoni, is upon information and belief, a resident of Santa Maria, California. He is the principal and owner of Peak Impact, LLC and Peak USA, LLC. Defendant Bessoni received $3,354,751.80 from RVG through his two shell companies, Peak Impact, LLC and Peak USA, LLC.

6. Peak Impact, LLC is, upon information and belief, an Oklahoma corporation with a principal place of business at 567 Camino Mercado Unit D, Arroyo Grande, CA 93420.

7. Peak USA, LLC is, upon information and belief, a Delaware corporation with its principal place of business located at 407 Traffic Way Suite C, Arroyo Grande, CA 93420-3371.

## JURISDICTION, VENUE AND STANDING

8. On August 17, 2012, the Securities and Exchange Commission filed the SEC Action in this Court pursuant to Sections 20(b), 20(d)(1) and/or 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a)] and Sections 21(d)(1), 21(d)(3)(A), 21(e) and/or 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(l), 78u(d)(3)(A), 78u(e) & 78aa] to halt the ZeekRewards Ponzi and pyramid scheme, freeze RVG's assets, and seek the appointment of a receiver for RVG.

9. On the same date, in an Agreed Order Appointing Temporary Receiver and Freezing Assets of Defendant Rex Venture Group, LLC (the "Agreed Order"), this Court authorized and directed Mr. Bell as RVG's Receiver to institute actions and legal proceedings seeking the avoidance of fraudulent transfers, disgorgement of profits, imposition of constructive trusts and any other legal and equitable relief that the Receiver deems necessary and appropriate to preserve and recover RVG's assets for the benefit of the Receivership Estate.

10. Within 10 days of his reappointment on December 4, 2012, the Receiver filed the original Complaint and Agreed Order in the SEC Action in all of the United States District Courts pursuant to 28 U.S.C. § 754 giving this Court jurisdiction over RVG's property in every federal district.

11. As an action brought by the Receiver in furtherance of his appointment and in the performance of his duties as directed by this Court, this Court has subject matter jurisdiction over this matter because this action is within the ancillary jurisdiction of this Court.

12. This action is also within the ancillary jurisdiction of this Court because this action concerns RVG's property and assets, which are now under this Court's exclusive jurisdiction.

13. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

14. Also, this Court has subject matter jurisdiction under 28 U.S.C. § 1367 because this action is directly related to the claims in the SEC Action, concerns property within this Court's exclusive control and/or is in furtherance of the duties given to the Receiver by this Court.

15. This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. § 754 and 28 U.S.C. § 1692.

16. This Court also has personal jurisdiction over the Defendants pursuant to N.C. Gen. Stat. §1-75.4 because, *inter alia*, these Defendants provided alleged goods to RVG, which operated in North Carolina, and they received payments from RVG through its banks located in North Carolina. By assisting the operation of the ZeekRewards scheme, including numerous communications with RVG and/or meetings in North Carolina, the Defendants created a substantial connection to North Carolina such that the exercise of personal jurisdiction over them is fair and just.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the acts and transfers alleged herein, as well as the harm sustained because of Defendants' actions and omissions, occurred in this District. Defendants provided alleged services to RVG in North Carolina, and these alleged services directed at North Carolina gave rise to the causes of action asserted below.

18. The Receiver has standing to bring the claims made in this action pursuant to his authority and the direction of this Court.

## FACTUAL BACKGROUND
*The ZeekRewards Scheme*

19. Beginning at least as far back as 1997, Paul Burks, RVG's owner and lead executive, operated a number of generally unsuccessful multi-level marketing businesses through Rex Venture Group, LLC (and related entities).

20. Dawn Wright-Olivares was RVG's Chief Operating Officer and the Chief Marketing Officer of ZeekRewards. Together with Burks, Wright-Olivares developed the ZeekRewards scheme.

21. Other key employees of RVG included Daniel ("Danny") Olivares, Wright-Olivares' stepson who was responsible for designing and running RVG's websites and databases with Burks; Alexandre ("Alex") de Brantes, Wright-Olivares' then-fiancée who had the title of Executive Director of Training and Support Services; Roger Plyler, who handled "affiliate relations"; and Darryle Douglas, who was a member of RVG's senior-level management. Collectively, these individuals may be referred to as RVG's "Insiders."

22. In 2010, RVG launched Zeekler.com, a so-called "penny auction" website where items ranging from personal electronics to cash were auctioned to bidders.

5

23. A "penny auction" does not work like a typical auction. In a normal auction, it costs nothing to bid, and the auction price rises based on the amount of the bid until there is no higher bid or the amount of time set for the auction expires. In a "penny auction," bids must be *purchased* by bidders, and each incremental bid placed raises the amount of the total price of the auction item only by $0.01. The winner pays the final auction price (plus the cost of bids used), which is theoretically well below the retail price. However, the unsuccessful bidders lose all the money they spent to purchase bids.

24. During 2010, the Zeekler penny auctions were not very successful, but RVG's fortunes changed in 2011. In January 2011, RVG launched a new money-making scheme – ZeekRewards. RVG promoted ZeekRewards as Zeekler.com's "private, invitation-only affiliate advertising division." In reality, ZeekRewards was just a multi-level marketing scheme grafted onto the Zeekler business. It falsely purported to pay a portion of the profits from the Zeekler penny auction business to participants who earned bid balances or points, primarily by buying auction bids. Also, participants in ZeekRewards, often called "Affiliates," were paid for recruiting other participants in a pyramid "multi-level" sales format.

25. The financial essence of the scheme – to buy bids to get a profit share and get paid for recruiting others to the scheme – was or should have been clear. From the beginning, RVG intended to use "bids" in ZeekRewards not as a product but as a proxy for money deposited into the program. Dawn Wright-Olivares was very clear about the plan, telling Danny Olivares on January 21, 2011: "We're just going to use bids as currency." On another occasion, Dawn Wright-Olivares referred to the compounding bids as "Monopoly money."

26. ZeekRewards emphasized that the offer to pay Affiliates for purchasing compounding / sample / VIP "bids" distinguished those bids from the simple purchase of retail

6

bids to participate in the Zeekler auctions. In the "About us" section of the ZeekRewards website, the company wrote: "PLEASE NOTE: To qualify for the 125% reward points you MUST buy the bids in the ZeekRewards back office. Bids purchased on the Zeekler Penny Auction site are 'retail customer' bids and do not qualify."

27. Further, ZeekRewards stated that even though bids bought through ZeekRewards could be used in the auctions, that fact was irrelevant to the multi-level marketing scheme. Affiliates were told that using the bids in the auction would have no effect on their all-important bid or points balance ("Each time you buy a Compounding Bid in your ZeekRewards Back Office a bid is added to the Compounding bucket. *Spending the bid in an auction does not remove it from the bucket*.") (emphasis added).

28. As one Affiliate told Burks, "I know how the system works mathematically and you know I know. Whether you call the bids bids or hamburgers makes no difference. People are not joining Zeek to get hamburgers, or auction bids; they are joining Zeek to make money…."

29. Not surprisingly, relatively few ZeekRewards non-retail bids were used in the Zeekler auctions. Prior to shutdown, RVG estimated that only approximately 19 million VIP bids were used in auctions out of over 7 billion VIP bids / points credited to Affiliates – less than 1/3 of 1%.

30. The ZeekRewards scheme, rather than the penny auction site, was the source of nearly all the company's income. Relative to ZeekRewards, little or no money was made in the Zeekler "penny auction" business. According to the ZeekRewards database, ZeekRewards sold approximately $820 million in compounding / sample / VIP bids, but only about $10 million in retail bids were sold.

*Defendants' Role in the Scheme*

31.     Defendants aided in perpetuating the scheme by helping maintain its false façade of a legitimate advertising entity. Defendants sold purported prospective customers or "leads" to RVG to sell or provide to Affiliates as potential customers of the penny auction business. From January until August 2012, Defendants sold thousands of these supposed "leads" to RVG, sometimes as many as 50,000 per week. When ZeekRewards was finally shut down in August 2012, Defendant had received more than $3.3 million from RVG. However, the leads were of little or no actual value to the auction business.

32.     The company's real need and use for the leads, which was upon information and belief known to Defendants, stemmed from its "bid giveaway" requirement instituted between August and September 2011. In an effort to maintain its appearance of legitimacy and to continue to attract new participants to the scheme, the company announced that Affiliates could no longer earn points by simply purchasing compounding bids. Instead, they would be required to purchase VIP bids and then "give them away" as alleged samples, ostensibly to draw customers to the auctions. The company anticipated that many affiliates would have a problem meeting the new requirement and that requiring Affiliates to locate their own actual customers would conflict with the company's promise of essentially passive income ("it only takes 3 minutes a day," etc.). To assuage these fears, the company announced that it would arrange to provide the customers to whom the Affiliates could "give" their bids and created programs to automatically give these "customers" the VIP bids purchased by Affiliates.

33.     The company purchased alleged "leads" from Defendant Bessoni through his two shell companies, and then provided them to Affiliates. Upon information and belief, the leads consisted of an email address, and a first and last name. On average, Defendants provided RVG

8

with approximately 10,000 leads per day. The company was purchasing 50,000 customers per week from Defendants in August 2012, just a week before the shutdown.

34. Whether the leads were legitimate or fake was irrelevant to Burks and the other RVG insiders, which was, upon information and belief, evident and known to Defendants. RVG's real purpose in purchasing the leads was to promote the scheme's false image as a legitimate advertising arm of the penny auction business. Upon information and belief, the company never verified whether the leads were truly legitimate customers or simply fabricated email accounts.

35. Defendant Bessoni even admitted in writing that he was unsure whether the leads he provided were real or fabricated. In an email to Burks in May 2012 he wrote, "I hesitate on bringing on more supply because I am not sure what you are getting as valid leads." In spite of this doubt regarding the quality of his product, Defendants accepted a wire transfer from RVG for nearly $120,000 one week after the email to Burks.

36. Although Defendants received more than $3.3 million from RVG, the leads Bessoni provided in return did not provide real business value to the Zeekler auction business. Relative to ZeekRewards, little or no money was ever made on the penny auction website. Indeed, the vast majority of VIP bids "given away" were simply never used. Of the 7 billion VIP bids created, RVG estimated that only 19 million were ever used in auctions. Of course, to the extent the leads provided by Defendants were simply fabricated email accounts, there was not even the pretense that the supposed "leads" would provide any value.

37. In sum, the leads Defendants provided were of little or no value and were simply used to perpetuate the ZeekRewards scheme. Defendants are therefore liable to repay to the

9

Receiver the more than $3.3 million Bessoni received from RVG through his two shell companies.

## FIRST CLAIM FOR RELIEF

### Fraudulent Transfer of RVG Funds in Violation of the North Carolina Uniform Fraudulent Transfer Act

1. The Receiver realleges and incorporates by reference the foregoing paragraphs.

2. As described above, in the course of operating the ZeekRewards scheme, Burks and others – through RVG – made numerous payments to Defendant Bessoni through his two shell companies, Peak Impact, LLC and Peak USA, LLC. These payments, which totaled at least $3,354,751.80, are collectively referred to as the "Transfers."

3. The Transfers were made within four years before the date of this action.

4. Each of the Transfers constitutes a "transfer" of an asset or an interest in an asset within the meaning of N.C. Gen. Stat. §39-23.1(12).

5. All of the Transfers occurred during the course of a Ponzi and/or pyramid scheme, when participant money was commingled and the Receivership Entities were effectively insolvent.

6. Each of the Transfers was to, or for the benefit of, Defendants.

7. Each of the Transfers was made with money misappropriated from one or more of the Receivership Entities. At all times relevant herein, the Receivership Entities had a claim to the funds used for the Transfers.

8. Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants. Specifically, the customer "leads" provided by the Defendants provided little or no value, and only served to perpetuate the Ponzi and pyramid scheme, causing far more

10

victims and harm to the financial markets than otherwise would have occurred had they not been provided.

9. Moreover, upon information and belief the Defendants did not act in good faith in obtaining the Transfers from RVG.

10. Each of the Transfers was made by Burks and others to further the Ponzi and/or pyramid scheme and was made with the actual intent to hinder, delay or defraud some or all of the Receivership Entities' then existing creditors.

11. In the alternative, at the time of each of the Transfers, the Receivership Entities were insolvent or became insolvent as a result of the Transfer; were engaged in a business or transaction, or were about to engage in a business or transaction, for which the remaining assets of the Receivership Entities were unreasonably small in relation to the business or transaction; or intended to incur, or believed that they would incur, debts that would be beyond their ability to pay as such debts became due.

12. The Transfers constitute fraudulent transfers avoidable by the Receiver pursuant to N.C. Gen. Stat. §39-23.4(a)(1), N.C. Gen. Stat. §39-23.4(a)(2) or N.C. Gen. Stat. §39-23.5 and recoverable from the Defendants pursuant to N.C. Gen. Stat. §39-23.7 and N.C. Gen. Stat. §39-23.8.

13. Pursuant to N.C. Gen. Stat. §39-23.4(a)(1), N.C. Gen. Stat. §39-23.7, N.C. Gen. Stat. §39-23.8 and 28 U.S.C. §2201, the Receiver is entitled to a Judgment: (1) avoiding the Transfers; and (2) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

### SECOND CLAIM FOR RELIEF
#### Common Law Fraudulent Transfer

14. The Receiver realleges and incorporates by reference the foregoing paragraphs.

15. Each of the Transfers constitutes a transfer of an asset or an interest in an asset of the Receivership Entities.

16. All of the Transfers occurred during the course of a Ponzi and/or pyramid scheme, when participant money was commingled and the Receivership Entities were insolvent.

17. Each of the Transfers was to, or for the benefit of, one or more of the Defendants.

18. Each of the Transfers was made with money misappropriated from one or more of the Receivership Entities. At all times relevant herein, the Receivership Entities had a claim to the funds used for the Transfers.

19. Each of the Transfers was made without receipt of reasonably equivalent value from the Defendants.

20. At the time of each of the Transfers, the Receivership Entities were insolvent, or became insolvent, as a result of the Transfer.

21. The Transfers constitute fraudulent transfers avoidable by the Receiver and recoverable from the Defendants.

22. Accordingly, pursuant to 28 U.S.C. §2201, the Receiver is entitled to a Judgment: (1) avoiding the Transfers; and (2) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the Receivership Estate.

### THIRD CLAIM FOR RELIEF
#### Unjust Enrichment

23. The Receiver realleges and incorporates by reference the foregoing paragraphs.

24. The Defendants each benefited from the receipt of money from the Receivership Entities in the form of alleged compensation and other payments which were the property of the Receivership Entities and for which the Defendants did not adequately compensate RVG or

12

provide value. Indeed, the leads provided by Defendants to RVG caused additional losses by helping to create and maintain the façade of legitimacy of the ZeekRewards scheme.

25. The Defendants have unjustly failed to repay RVG for their profit and the excessive benefits they received.

26. The enrichment was at the expense of the Receivership Entities and ultimately at the expense of RVG's creditors / victims.

27. Equity and good conscience require full restitution of the monies received by the Defendants for distribution to RVG's creditors / victims.

28. Accordingly, the Receiver, on behalf of RVG, is entitled to an award of full restitution from the Defendants in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### Constructive Trust

29. The Receiver realleges and incorporates by reference the foregoing paragraphs.

30. As alleged above, the assets of the Receivership Entities have been wrongfully diverted as a result of fraudulent transfers to the Defendants for their individual interests and enrichment.

31. The Receiver has no adequate remedy at law.

32. Because of the fraudulent transfers, the Receiver is entitled to the imposition of a constructive trust with respect to any transfer of funds, assets, or property from the Receivership Entities, as well as any assets received by Defendants in the past or on a going forward basis as a result of those transfers from the Receivership Entities.

33. The Receiver is entitled to and demands title, possession, use and enjoyment of the foregoing property for the benefit of the Receivership Estate.

**PRAYER FOR RELIEF**

WHEREFORE, the Receiver respectfully requests that the Court:

1. Enter Judgment against each of the Defendants jointly and severally for the full amount of the funds they received from RVG as detailed above and for all damages and losses suffered by RVG and the Defendants' unjust enrichment in an amount to be determined at trial.

2. Award the Receiver just and reasonable attorney fees, subject to Court approval, which are justified in light of the costs to the Receivership Estate in bringing this action.

3. Award prejudgment and post-judgment interest, costs and such other and further relief as the Receiver is entitled to recover.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury in this action of all issues so triable.

Dated: May 27, 2015                     Respectfully submitted,

/s/ Irving M. Brenner
Kenneth D. Bell, Esq., Receiver
Irving M. Brenner (NC Bar No. 15483)
Matthew E. Orso (NC Bar No. 42409)
McGuireWoods LLP
201 North Tryon Street, Suite 3000
Charlotte, North Carolina 28202
(704) 343-2000
(704) 373-8836 (fax)
kbell@mcguirewoods.com
ibrenner@mcguirewoods.com
morso@mcguirewoods.com